IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENT DEUTSCH d/b/a DEUTSCH OIL CO.,

    *Plaintiff,*

vs.

BITCO GENERAL INSURANCE CORP. f/k/a BITUMINOUS CASUALTY CORP.,

    *Defendant.*

Case No. 21-1150-EFM

**MEMORANDUM AND ORDER**

    Plaintiff Kent Deutsch alleges that his insurer, Defendant BITCO General Insurance Corporation, was required to provide him with a defense and coverage in two state lawsuits alleging misallocation of oil royalties. Defendant argues that the claims in the state lawsuits are not covered in the policies it issued. Plaintiff and Defendant have both moved for summary judgment. (Docs. 19, 23). For the following reasons, the Court grants Defendant's motion, and denies Plaintiff's motion.

    **I.**    **Factual and Procedural Background**

    Beginning in 2012, BITCO issued six annual insurance policies to Deutsch, who does business as Deutsch Oil Company. These policies include a Commercial General Liability (CGL) Coverage Form which provides:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

   * * *

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II—Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The term "property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For purposes of this insurance, electronic data is not tangible property.

The CGL Policies also include a Damage to Property Exclusion, of which two are potentially relevant. The Policies provide:

    **2.**      **Exclusions**

This insurance does not apply to:

    **a.**      **Expected Or Intended Injury**

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

\* \* \*

    **j.**      **Damage to Property**

        "Property damage" to:

\* \* \*

      (4) Personal property in the care, custody or control of the insured[.]

At all relevant times, Deutsch was the assignee and operator of an oil and gas lease filed of record on October 10, 1967, in Book 67, page 337, in the office of the Stafford County Register of Deeds. The Morrison Lease includes "The East Half of the Northeast Quarter (E/2 NE/4) of Section Twenty-eight (28), Township Twenty-one (21) South, Range Thirteen (13) West, Stafford County."

The Morrison Lease consists of a divided 80-acre tract: the 10-acre Morrison A Tract and the 70-acre Morrison B Tract. The tracts were divided in 1983 when the surface rights were

sold. The first producing well on the Morrison Lease was the Morrison A well, drilled in 1970 at the center of the A Tract. The lease authorized Deutsch to drill, produce, and market oil, with the lessor retaining a 1/8 interest in the oil produced.

Deutsch Oil Company, as "Seller," entered into a Crude Oil Purchase Agreement ("COPA") with "Buyer" Sunoco Partners Marketing & Terminals, under which Sunoco agreed to buy all of the crude oil and condensate produced from the Morrison Lease. Deutsch represented it was authorized to sell oil from the lease and Sunoco agreed to pay pursuant to its division order. The agreement provided that "Delivery shall take place and title shall pass from the Seller to the Buyer when the crude oil passes the outlet flange of the Seller's lease facility to the receiving equipment of Buyer or Buyer's designated agent."

In 2012, Deutsch drilled another well on the property. Deutsch contends that he only learned later that the property had been divided into A and B Tracts. The 2012 well is in the B Tract, and is commonly referred to as the Morrison B well, although during the course of the litigation it has also been known as Morrison A # 2. This well produced from January 2013 through March 2014 when it was temporarily shut-in by Deutsch. Minerals from this well were owned by the Oliver Batman Revocable Trust #1, which should have received the royalty payments for production from it.

On August 21, 2014, Deutsch sent letters to three entities (Robro Royalty Partners, Bitter End Royalties, and Vendetta Royalty Partners) stating it had "incorrectly paid [them] royalty income" from the Morrison B well. The letters stated that the Batman Trust ("[t]he landowners who should have received the royalty income . . . have made a claim against Deutsch Oil," and asked each entity to reimburse Deutsch for the overpayments (respectively, for $26,249.71, $118,419.74, and $19,802.41.).

-4-

Marilyn E. Batman, individually and as trustee of the Batman Trust sued Deutsch in Stafford County District Court (Case No. 2015-CV-06) for breach of contract, conversion, and negligence. The Trust alleged that, as the owner of the mineral interests and pursuant to the Morrison Lease, it was entitled to one-eighth (1/8) of the oil from the B Well. It alleged that it was damaged in the amount of $157,099.10 for unpaid royalties. After a bench trial, the court entered judgment in favor of the Trust against Deutsch in that amount of $157,099.10. The court concluded Deutsch "breached the royalty covenant of the lease contract and is without a valid defense."

The Trust also named Robro and Bitter End as Third-Party Defendants. In the Pretrial Order, the Trust complained that it had been deprived of "$157,099.10 in royalty payments which it was entitled to receive." At the conclusion of the bench trial, the court entered judgment against Robro in the amount of $25,037.02 and against Bitter End in the amount of $113,111.35. The court held that Robro and Bitter End "admitted that they received royalty payments from the Morrison B well that they were not entitled to, because they should have been paid to Plaintiff, Batman Trust, and that it would be unfair for them to keep the payments."

On November 3, 2015, Deutsch sent a notice of claim to BITCO seeking coverage under the governing policies, attaching a copy of the Trust's First Amended Petition in the Stafford County action.

One week later, BITCO denied both coverage and a defense, stating that petitions in the Stafford County action "did not allege an 'occurrence' or 'property damage' as defined by the Commercial General liability Coverage form."

On December 16, 2015, Deutsch's personal attorney wrote to BITCO, asking that it reconsider. Counsel included Kansas decisions, which he suggested showed that conversion may arise from an unintentional or negligent act.

On February 5, 2016, BITCO again denied coverage.

While the first action was under way, Robro and Bitter End sued Deutsch and Sunoco in Stafford County (No. 17-CV-13). The plaintiffs asserted claims against Deutsch for: (1) breach of contract, (2) unjust enrichment, (3) fraud and fraudulent concealment, (4) conversion, (5) accounting demand, (6) civil conspiracy, and (7) declaratory judgment.

The plaintiffs claimed that the B Tract contained two wells, the Morrison "B" Well and the Batman-Morrison #1 Well. They alleged that Deutsch never credited them with royalty on unit production, and that "[a]ll royalty allocable to Plaintiffs on production from the Batman-Morrison #1 unit has been credited to Batman." According to Robro and Bitter End, Deutsch and Batman had devised a "litigation plan," under which Deutsch would confess judgment "down the road," after seeking indemnification against them:

> When Batman discovered the commingling problem she went to Deutsch and demanded compensation for the value of her missing royalty oil. Soon after, Batman and Deutsch began settlement talks. During the course of those talks Deutsch stipulated to the value of Batman's missing royalty share and proposed a litigation plan against [Robro and Bitter End]. Their plan was for Batman to file suit against Deutsch and for Deutsch to immediately answer and implead Plaintiffs. Deutsch also advised Batman that he would confess judgment "down the road" but that he wanted to leave Batman in the lawsuit for a period of time to facilitate the prosecution of an indemnity claim against Plaintiffs.[1]

Robro and Bitter further alleged that, as a part of this plan, Deutsch also worked to create a means by which they would in effect "unwittingly compensate" the Trust for lost royalties:

---

[1] *Robro Royalty Partners v. Deutsch*, No 2017-CV-000013 (Stafford Cty. Kan.), Plaintiff's Original Petition and Jury Demand, at ¶ 24, Exh. 20-24.

> Before suit was filed, Deutsch got Plaintiffs to execute an amendment to the Morrison Lease (the "Unitization Amendment"), which authorized Deutsch to unitize the acreage covered by the Morrison Lease. Units formed under the Unitization Amendment were not to exceed 20 acres in size, and production from each such unit was to be allocated by surface area. The Unitization Amendment required the execution and recordation of an instrument identifying the unitized acreage.[2]

According to Robro and Bitter End, Deutsch then formed a 20-acre unit (Batman-Morrison #1) which included a substantial portion of the A Tract, and credited the Trust with royalties based on production from a part of the A Tract, even though the Trust had no right to receive royalties from that tract. As a result, Robro and Bitter End alleged, they received "financial injuries" in the form of unpaid royalties.

Deutsch tendered the second suit to BITCO. On July 25, 2017, BITCO denied coverage and a defense. Deutsch disputed the denial in an August 17, 2017 letter, and asked for reconsideration. BITCO reiterated its denial on September 11, 2017.

In his motion to dismiss the second action, Deutsch summarized the action as "a dispute over the payment of royalties from oil produced on the Morrison Oil and Gas lease." He argued that Robro and Bitter End were "attempting to take another shot at litigating their right to receive royalty payments from the Morrison Lease."

Plaintiff commenced the present action in Sedgwick County District Court against numerous defendants. With respect to BITCO, the Petition sought a declaration that the insurer had an obligation to defend him and pay any judgments in the first and second suits. The Petition also sought a money judgment against BITCO for failing to conduct a reasonable

---

[2] *Id*. at ¶ 27.

investigation and for failing to meet its obligations to defend and pay. BITCO removed the action to this Court on June 9, 2021.

On July 5, 2021, Plaintiff filed an Amended Complaint against BITCO alone, which stresses that both state actions alleged negligence and conversion, and further stating that under Kansas law intent is not necessary to prevail on a conversion claim. The Amended Complaint alleges Defendant breached its contract and its duty of good faith and fair dealing by failing to offer coverage and a defense, by failing to conduct a reasonable investigation of the state litigation, and by misrepresenting policy provisions.

In response to Defendant's summary judgment motion, Plaintiff presents a substantial number of additional allegedly uncontroverted facts which, in many instances, appear to essentially relitigate issues from the state litigation. Defendant requests that the Court strike many of these alleged uncontroverted facts, arguing they rest on Plaintiff's affidavit, and that the affidavit flatly contradicts sworn testimony and pleadings introduced on his behalf in the state litigation.[3] The Court need not resolve these additional factual issues, as the uncontroverted, material facts set forth above are sufficient to resolve the parties' summary judgment motions.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5] The

---

[3] *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[4] Fed. R. Civ. P. 56(a).

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6] If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[7] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[8] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[9]

### III. Analysis

A breach of contract under Kansas law requires proof of "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract, (3) the plaintiff's performance or willingness to perform in compliance with the contract, (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[10] Insurance policies are contracts in Kansas,[11] and include a duty for all parties to perform their obligations in good faith.[12] This duty grows out of the contract obligations and "only amplifies duties and

---

[6] *Thom v. Bristo-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[7] *Id.* (citing Fed. R. Civ. P. 56(e)).

[8] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[10] *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013) (citing *Com. Credit Corp. v. Harris*, 212 Kan. 310, 510 P.2d 1322, 1325 (1973)).

[11] *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015).

[12] *Progressive Nw. Ins. Co. v. Gant*, 2018 WL 3472796, at *19 (D. Kan. 2018) (citation omitted).

rights already existing under the terms of the agreement."[13] An allegation that another party has breached an implied covenant is not a separate claim, but a "legal argument related to a breach-of-contract claim."[14] Hence, "in order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term in the contract 'which the defendant[] allegedly violated by failing to abide by the good faith spirit of that term.' "[15]

"Under Kansas law, an insurer has a duty to defend if there is any potential for liability under a policy of insurance."[16] An insurer must undertake a good faith analysis of all information known to it or reasonably ascertainable by inquiry and investigation to determine the possibility of coverage.[17] In evaluating whether coverage is possible, the insurer must look beyond the pleadings themselves and consider any facts brought to its attention or which it could reasonably discover.[18] But the insurer has no duty to defend an action which is "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured."[19] The insured has the burden to prove that

---

[13] *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1345 (D. Kan. 2016) (quoting *Pizza Mgmt., Inc. v. Pizza Hut, Inc*., 737 F. Supp. 1154, 1184 (D. Kan. 1990)).

[14] *Classico, LLC v. United Fire & Cas. Co*., 2016 WL 7324451, at *5 (Kan. Ct. App. 2016).

[15] *Id*. (quoting *Wayman v. Amoco Oil Co*., 923 F. Supp. 1322, 1359 (D. Kan. 1996)).

[16] *Hartford Fire Ins. Co. v. Vita Craft Corp*., 911 F. Supp. 2d 1164, 1175 (D. Kan. 2012) (citations omitted).

[17] *See Park Univ. Enter. v. Am Cas. Co*., 314 F. Supp. 2d 1094, 1101 (D. Kan.2004) (insurer has a duty to defend if there is even a remote possibility of coverage).

[18] *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.,* 212 Kan. 681, 512 P.2d at 403, 407 (1973).

[19] *Id*. at 406.

coverage exists under the policy; the insurance company has the burden to show that a specific provision of the policy excludes coverage.[20]

Defendant argues that the state litigation raised no possibility of coverage because the plaintiffs in those actions did not allege any "property damage" under the CGL policies. The relevant policies provide that "property damage" arises solely through either physical damage or the loss of use of "tangible property." Defendant contends that the alleged misallocation of royalties from oil produced under the Morrison Lease are purely intangible losses, and could not constitute losses covered under the CGL policy. Specifically, in the first suit, the Batman Trust did not allege that Deutsch caused physical injury to tangible property, or alleged that it had lost the use of tangible property due to nonphysical injury. During oral arguments on Deutsch's Motion for Summary Judgment in the first action, his counsel stressed that "we are here today essentially because the Batman Revocable Trust, who owned the minerals at that time, was not paid royalty for the oil produced from the [B Well] when it produced January [20]13 through March 2014." Similarly, Robro and Bitter End argued in the second suit that Deutsch and the Trust had essentially conspired to defeat their own royalty interests in oil produced from the Morrison tract.

In support of its motion, Defendant cites Kansas decisions holding that insurance policies covering damage to tangible property do not cover losses resulting from purely economic damages.[21] The lost income from the oil production are mere economic damages, it argues, and thus do not reflect "property damages" under the CGL policies in question. Similarly, Defendant

---

[20] *Shelter Mut. Ins. Co. v. Williams*, 248 Kan. 17, 804 P.2d 1374, 1383 (1991).

[21] *See Safeco Ins. Co. of Am. v. Tozier*, 1994 WL 476304, at *4 (D. Kan. 1994); *Bendis v. Hartford Accident & Indem.*, 1993 WL 463617, at *2 (D. Kan. 1993) ("an economic loss of investment does not constitute loss of tangible property").

notes, this court has concluded that "the loss of the use of escrow payments wrongfully withheld by an escrow agent does not constitute property damage."[22] This decision relies in part on a standard definition for "tangible property" from Black's Law Dictionary: "Property that has physical form and substance and is not intangible. That which may be felt or touched, and is necessarily corporeal, although it may be either real or personal (e.g. ring or watch)."[23] Defendant also notes the Tenth Circuit's observation that "[i]t seems obvious to us that failure to pay money owed as a debt is not the deprivation of use of tangible property."[24]

Plaintiff argues the Court should not rely on authorities such as Black's Law Dictionary, a resource "for the specialized field of lawyers and judges," inapplicable to explain the ordinary sense of words in the policy. Plaintiff offers an alternative dictionary definition of "tangible," which would include anything "capable of being appraised at an actual or approximate value."[25] Finally, Plaintiff asserts that the state litigation was covered under the CGL policies because "[o]il can be felt or touched and is corporeal."

But neither of the state lawsuits involved claims that Plaintiff wrongfully removed oil from the property. The Morrison Lease gave Plaintiff the right to produce oil from the 80-acre tract. The first state action arose when the Batman Trust alleged it was not paid royalties from oil produced from its portion of the land. In the second action, the other royalty interest owners alleged that Plaintiff and the Trust unfairly conspired to deprive them of their rights. None of the parties in either state action argued the oil should have been left in the ground; they argued they

---

[22] *Sec. State Bank v. Aetna Cas. & Sur. Co.*, 825 F. Supp. 944, 949 (D. Kan. 1993),

[23] *Tangible Propoerty*, Black's Law Dictionary, 1456 (6th ed. 1990).

[24] *Mullin v. Travelers Indem. Co.*, 541 F.3d 1219, 1224 (10th Cir. 2008) (applying Utah law).

[25] *Tangible*, Merriam-Webster's Collegiate Dict. 1276 (11th ed. 2003).

were cheated out of their share in the money made from the oil after severance. Accordingly, the question is whether a royalty interest can be considered "tangible" property.

The definition of "tangible" recognized in Black's Law Dictionary is no anomaly. It stems directly from its Latin (*tangibilis*) and French (*tangere*) origins, which mean "that [which may] be touched."[26] It is also an understanding shared by other authorities. The American Heritage defines "tangible" as something "[d]iscernable to the touch, palpable . . . [p]ossible to touch . . . real or concrete."[27] According to Webster's, it is something "capable of being touched: able to be perceived as materially existent esp. by the sense of touch: PALPABLE, TACTILE."[28]

Even the dictionary cited by Plaintiff recognizes[29] that the *primary* definition of "tangible property" is something that is either "capable of being perceived especially by the sense of touch" or is "substantially real," an understanding very close to the Black's Law Dictionary definition abhorred by Plaintiff. Moreover, this secondary, alternative definition of "tangible" as anything which can be "appraised" is plainly overbroad in light of the caselaw. The value of the escrow payments, after all, can be easily appraised—yet the court in *Security State Bank* had no trouble saying the right to receive such payments was not a tangible interest.[30]

---

[26] *Tangible*, Oxford English Dict. 610 (2d ed. 1989).

[27] *Tangible*, Am. Heritage Dict. of the Engl. Lang. 1242 (2d College ed. 1982).

[28] *Tangible*, Webster's Third New Int'l Dict. 2337 (1976).

[29] Merriam-Webster's Collegiate Dict. at 1276.

[30] *Sec. State Bank*, 825 F. Supp. at 949.

Plaintiff's disparagement of Black's Law Dictionary as a tool for understanding policy language is misplaced. Black's has been routinely cited by both state courts.[31] and federal courts[32] in Kansas to aid in defining policy terms. Indeed, Judge Crow has cited Black's on precisely this issue, concluding that "an implied contract of employment is not 'tangible property' within the meaning of the insurance policy" at issue.[33] Similarly, in an action alleging the defendant dental group had driven the plaintiffs from their practice, Judge Vratil reached the same conclusion citing the same authority—the policy provided no coverage because the displaced dentists sought recovery "only for emotional and economic harm (including lost income, profits and patients), and not any loss of use of tangible property."[34] Further, after observing that an Oklahoma insurance policy did not expressly define the term "tangible" property, the Tenth Circuit cited Black's Law Dictionary as helping to "give the term its plain and ordinary meaning."[35]

---

[31] *See Narron v. Cincinnati Ins. Co.*, 32 Kan. App. 2d 28, 78 P.3d 1188, 1194 (2003) (citing Black's definition of "collectible" to help define term used in insurance policy), *aff'd in part, rev'd in part on other gds.*, 78 Kan. 365, 97 P.3d 1042 (2004); *AMCO Ins. Co. v. Beck*, 261 Kan. 266, 929 P.2d 162, 169 (1996) (citing Black's on definition of "the insurance policy's definition of 'business' "); *Friday v. Trinity Universal of Kan.*, 22 Kan. App. 2d 935, 924 P.2d 1284, 1286 (1996) (citing Black's in defining insurance contract's "appraisal" clause); *Crescent Oil Co. v. Federated Mut. Ins. Co.*, 20 Kan. App. 2d 428, 888 P.2d 869, 871 (1995) (citing Black's to help define "contamination" as used in policy, immediately after observing that "terms within an insurance contract are to be given their plain, ordinary and popular meanings"); *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 744 P.2d 840, 842 (1987) (meaning of word "insured"); *Frasher v. Life Investors Ins. Co.*, 14 Kan. App. 2d 583, 796 P.2d 1069, 1071 (1990) (same).

[32] *State Auto Prop. & Cas. v. Lewis*, 8 F. Supp. 3d 1303, 1308 (D. Ka. 2014) (citing authorities including Black's to define meaning of "vacant" as used in policy); *Union Ins. Co. v. Mendoza*, 2009 WL 10689836, at *3 (D. Kan. 2009) (citing Black's to help define term "pollutant" in policy); *Dillon Cos. v. Royal Indem. Co.*, 369 F. Supp. 2d 1277, 1289 (D. Kan. 2005) (citing Black's after observing that "the court will look to the usual and accepted definitions of the words used in the additional insured endorsement").

[33] *Lapeka, Inc. v. Sec. Nat. Ins. Co.*, 814 F. Supp. 1540, 1549 (D. Kan. 1993) (citing Black's Law Dictionary (6th ed. 1990).

[34] *Cincinnati Ins. Co. v. Gage Ctr. Dental Grp.*, 2013 WL 5913751, at *10 (D. Kan. 2013).

[35] *State Farm Fire & Cas. Co. v. Dawson*, 687 F. App'x 740, 745 (10th Cir. 2017) (holding that teacher accused of inappropriate relationship with student who subsequently withdrew from in-person schooling was not

But courts have not merely recognized that economic interests, as a general matter, are not tangible in nature. Relevant decisions also directly indicate that royalty interests are not tangible. In an early case, the Kansas Supreme Court recognized that "[o]il and gas leases, so called, do not affect severance of the mineral, but *they are the source of intangible interests*, often of great value, which are proper subjects of taxation."[36] Similarly, in the Tenth Circuit case just mentioned, the court quoted Oklahoma authority on the distinction between tangible and intangible interests: "An inventor sells intangible intellectual property [ideas, skill, or patent rights] in return for which the inventor receives a royalty. A manufacturer, on the other hand, sells tangible personal property."[37] Decisions from other jurisdictions take a similar view.[38]

Accordingly, the Court concludes that the two state actions did not allege "property damage" under the CGL Policies issued by Defendant because they addressed only intangible

---

covered under homeowner's policy for the student's lawsuit alleging "she had to finish high school on the internet, rather than in brick and mortar high school," because "[a]n education cannot be felt, it lacks physical form, [and thus] is not tangible property").

[36] *Robinson v. Jones*, 119 Kan. 609, 240 P. 957, 959 (1925) (emphasis added).

[37] *Dawson*, 687 F. App'x at 745 (quoting *Blitz U.S.A., Inc. v. Okla. Tax Comm'n*, 75 P.3d 883, 888–89 (Okla. 2003)).

[38] *See, e.g., Blake v. Prof'l Coin Grading Serv.,* 898 F.Supp.3d 365, 386-87 (D. Mass. 2012) (Plaintiff's "conversion claim as to royalties and sale proceeds is also not viable" as such rights "are considered intangible property"); *Cadkin v. Loose*, 2008 WL 11336390, at *4 (C.D. Cal. 2008) (Plaintiff "is not seeking return of tangible property [but] to recover royalties that he claims were due to him."); *Tarrant v. Capstone Oil & Gas Co*., 178 P.3d 866, 872 (Okla. Civ. App. 2007) ("The failure to pay royalties in this case created a debt; it did not result in Royalty Owners being deprived of tangible personal property."); *Jacob v. Kimberly-Clark Corp*., 2006 WL 1582149, at *6 (E.D.N.Y. 2006) (dismissing conversion claim for royalty revenues, finding "inapposite" the cases cited by plaintiff which "deal with specific, tangible property"); *Blausey v. Stein*, 1978 WL 214959, at *7 (Ohio Ct. App. 1978) ("A royalty is an intangible right, readily severable from the land and fully alienable."), *aff'd*, 400 N.E.2d 408 (1980); *Bell v. Bayly Bros. of Cal.*, 53 Cal. App. 2d 149, 157, 127 P.2d 662, 666 (1942) ("[O]il royalties . . . are obviously of some intangible nature and apparently personal property.").

rights. In light of this conclusion, Defendant is entitled to a dismissal of the Amended Complaint.[39]

In addition to arguing that the state litigation did not raise any claim of "property damage" as defined in the policies, Defendant also argues that those actions could not fall within the policies for two further reasons. First, the state actions alleged intentional misconduct by Plaintiff, which would mean there was no "occurrence" under the policy (which requires an "accident") and that result was an "expected or intended" injury under Exclusion 2(a). Second, Defendant argues, even if the Court were to consider the damaged "property" at issue in the state actions to be the oil itself, rather than the various royalty interests, the oil (once severed) would be personal property under Kansas law, and the state actions would thus fall within Exclusion 2(j) for injury to personal property under the insured's control.[40]

The Court need not resolve either issue, because (as discussed above) the state litigation was centered purely on royalty interests, and did not reflect claims of "property damage" as that term is defined in the CGL Policies. This conclusion is also fatal to Plaintiff's various affirmative claims against BITCO, however denominated. Plaintiff has presented no admissible evidence of any specific representation by BITCO to him which would have somehow suggested

---

[39] Defendant's motion (Doc. 19, at 5) asks simply for a dismissal of the Amended Complaint with prejudice. It concludes its Memorandum in support of the motion, however, with the suggestion that the Court should also award Defendant its costs and attorneys' fees. (Doc. 20, at 28). Aside from this bare conclusion, Defendant's memorandum makes no mention of costs or attorneys' fees, or explain the basis for such an award. Defendant's Rely (Doc. 28) is also silent on the issue. The Court's Order is restricted to the relief sought in the motions of the parties.

[40] *See Rucker v. DeLay*, 295 Kan. 826, 289 P.2d 1166, 1169 (2012) ("A royalty interest refers to the right to share in the production of oil and gas at severance [and] is considered personal property. Royalty interests are often contrasted with mineral interests, which refer to oil and gas in place.").

that, contrary to the plain language of its policies, it did after all provide coverage for intangible injuries.[41]

Similarly, Plaintiff's argument that BITCO failed to conduct a reasonable investigation fails to present a valid claim for relief, as he has not shown how any amount of investigation would have yielded a different result on the key question in the case—that is, how further investigation would have made the intangible tangible.

---

[41] Plaintiff cites an exhibit, apparently taken from BITCO's website, which states in passing that Defendant can "tailor coverages and services to fit the unique needs of your business."  (Doc. 22-3, ¶ 93).  Leaving aside the fact that Plaintiff avoids stating that he viewed and relied upon that website information, such an utterly generic comment would not alter the express terms of the CGL policies, which unambiguously restrict "property damage" to tangible property.  *See Perry v. Perry*, 2017 WL 791556, at *5 (Mich. Ct. App. Feb. 28, 2017) ("[L]anguage on the [insurer's] website [is] irrelevant because our focus is limited to a review of the plain language of the insurance policy.")

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**; Plaintiff's Motion for Summary Judgment (Doc. 23) is **DENIED**. Defendant BICO's Motion for Hearing (Doc. 35) is **DENIED** as moot in light of this Order.

**IT IS SO ORDERED**.

This closes the action.

Dated 16th day of March, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE